UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jianmin Jin and Chunyou Xie, | 16-cv-5633 (ARR) (JO) |
| Plaintiffs, | |
| — against — | **Opinion & Order** |
| Shanghai Original, Inc. et al., | **Not for electronic or print publication** |
| Defendants. | |

ROSS, United States District Judge:

This is an action by Jianmin Jin ("plaintiff" or "Jin") against Joe's Shanghai restaurant in Flushing, Queens, for unpaid wages pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the New York Labor Law ("NYLL").[1] Plaintiff was employed as a kitchen worker at the Flushing restaurant from September 10, 2014, until May 2, 2015. On July 15, 2019, I held a bench trial to determine the restaurant's liability, if any. After careful consideration of the evidence introduced at trial and the relevant law, I find that the restaurant is liable for FLSA and NYLL violations and that Jin is therefore entitled to relief.

DISCUSSION

I. **Findings of fact**

A. **Joe's Shanghai restaurant**

Joe's Shanghai restaurant has locations in Midtown Manhattan, Chinatown, and Flushing, Queens. *See* Joint Pretrial Order 26 ¶ 2 ("JPTO"), ECF No. 142. The Flushing location opened in

---

[1] Chunyou Xie, the other named plaintiff in this action, was precluded from testifying at trial (*see* Min. Entry, ECF No. 76), and no records exist pertaining to his employment. During the July 11, 2019 pretrial phone conference, plaintiff's counsel acknowledged that he would be unable to make out a claim on behalf of Xie at trial. Xie's claims are therefore dismissed without prejudice. Further, although this case was originally filed as a class action, the class was decertified before trial. *See* July 10, 2019 Order, ECF No. 181. Accordingly, this opinion is limited to Jin's claims.

1

1994. *See* Trial Tr. 85:11–21, ECF No. 188-1. It was originally owned and operated by Shanghai Original, Inc. ("Original"). *See id.* at 86:20–22. When formed, Original had five shareholders, including Kiu Sang Si, Tun Yee Lam, and Yiu Fai Fong. *See id.* at 85:22–86:2. As of 2012, Si, Lam, and Fong were the only remaining shareholders. *See id.* at 86:3–14. That same year, Si sold his shares to Lam (*see id.* at 86:15–25, 116:25–117:10), and in 2013, Lam and Fong formed East Brother Corp. ("East Brother") to take over the ownership and operations of the Flushing location (*see id.* at 117:11–23).[2] Since he sold his shares, Si—who was once the head chef at the Flushing location—has not been involved in running that location. *See id.* at 87:1–3, 98:6–8, 118:3–10. During Jin's employment, Si would occasionally visit the Flushing restaurant to have dinner with his family (*see id.* at 93:17–94:1), and at times he would go into the kitchen to "say hello" to the head chef, Gui Bing Shi (*see id.* at 101:9–102:5).[3] Si is a part-owner of the Chinatown and Midtown locations. *See id.* at 88:19–25, 89:16–22.[4] In 2014 and 2015, Si would use East Brother's truck three days per week to deliver food to the Chinatown and Midtown restaurants. *See id.* at 94:23–96:13.[5] Si paid Lam and Fong $600 per month in cash to use the truck. *See id.* at 95:17–96:1, 149:11–19. Si would also occasionally deliver raw fish to the Flushing location as a favor to Lam and Fong, when "they couldn't get [the fish they wanted] in Flushing." *Id.* at 99:14–20. He was reimbursed for any fish that he purchased. *See id.* at 99:21–

---

[2] Since 2017, Lam has been the sole shareholder of East Brother. *See* JPTO 26 ¶ 1.

[3] While Jin testified that Si would make food when he visited Shi in the kitchen (*see* Trial Tr. 18:1–5, 18:11–19:1), I found Si's testimony that he did not have the authority to use the kitchen more credible (*see id.* at 94:2–6, 102:10–13). I note, however, that even if Si did use the kitchen, my conclusion that Si was not plaintiff's employer would remain the same. *See infra* Section II.A.

[4] The Midtown location is owned by Shanghai City Corp. ("City"), and the Chinatown location is owned by Shanghai Duplicate Corp. ("Duplicate"). *See* JPTO 23 ¶ 2.

[5] This arrangement was convenient for Si, as he purchased his supplies from the store Dai Chuang Wah located in Flushing. *See* Trial Tr. 94:23–95:16.

24. The owners of the Flushing location are not involved in managing the Chinatown and Midtown locations, and vice versa. *See id.* at 89:4–15, 90:2–13; *see also Jin v. Shanghai Original, Inc.*, No. 16-cv-5633 (ARR)(JO), 2018 WL 1597389, at *1 (E.D.N.Y. Apr. 2, 2018) ("Although they share a single name and website, the three locations of Joe's Shanghai are now independently owned and managed. The website was created when Kiu Sang Si owned a part of all three restaurants, and has not been changed since for reasons of economy. Si created the menu for Joe's Shanghai; although each location has its own chef, the menus for all three locations are 'more or less the same.'" (citations omitted)).[6]

During Jin's employment, Fong managed the dining room, Shi managed the kitchen, and Lam "was considered the general manager." Trial Tr. 117:18–118:25. Lam and Fong were responsible for setting the employment policies. *See id.* at 118:11–14. All employees were required to clock in at the beginning of the day and clock out at the end of the day. *See id.* at 13:10–13. According to Fong, it was the restaurant's practice to pay employees minimum wage for 40 hours of work per week and overtime for all hours worked in excess of 40 hours. *See id.* at 119:1–120:5 (testifying that he and Lam met with an accountant annually to determine the appropriate minimum wage and overtime rates); *see also id.* at 122:13–123:11, 124:7–125:23. While Fong testified that the restaurant complied with all wage and notice requirements under

---

[6] Xin He, a kitchen worker, testified that he transferred from the Chinatown restaurant to the Flushing restaurant in 2015, and from the Flushing restaurant to the Midtown restaurant in 2016. *See* Trial Tr. 51:15–52:7. Despite plaintiff's belabored attempt at trial to show that He's movements were directed by Si, He's testimony simply does not support that proposition. *See id.* at 55:15–56:2, 70:24–71:5, 72:5–9 (testifying that Cai, the head chef at the Chinatown restaurant, recommended He for an open position in Flushing because He lived in Flushing); *id.* at 56:24–57:13 (testifying that Si "arranged" for him to go to Midtown). Jin and He both referred to Si as the "big boss" (*see, e.g., id.* at 4:10, 53:17–18); however, while working at the Flushing restaurant in 2014–2016, they never received instructions from Si (*see id.* at 6:3–7), observed him pay employees (*see id.* at 69:7–9), or witnessed him do any task other than drop off food (*see id.* at 4:17–21, 5:24–6:2, 58:22–59:2, 60:22–61:24). Jin even testified that he never spoke with Si. *See id*. at 6:8–9. Further, Hai Hua Zhai, who was called to testify about Si's role at the Flushing restaurant, stated that he had never seen Si in any restaurant other than Midtown. *See id.* at 82:21–83:14, 83:19–84:3.

federal and state law during Jin's employment, all relevant records were lost in November 2016. *See id.* at 130:22–131:13, 131:23–132:3, 137:15–138:15, 153:15–19, 155:21–156:6, 157:9–158:1.

### B. Jianmin Jin

Jin was hired by Shi in 2014 to work in the kitchen of the Flushing restaurant. *See id.* at 5:8–9, 8:24–9:2.[7] His daily duties primarily consisted of washing and cutting vegetables. *See id.* at 15:13–24. At the time he was hired, Jin did not receive or sign a written notice explaining his wages and hours. *See id.* at 9:10–12, 25:16–19. Rather, on his second or third day of work, Jin received a piece of paper with his weekly wage written on it (*see id.* at 9:13–21), and a written schedule showing him working six days and 57.5 hours per week (*see id.* at 25:20–26:20; *see also* Pl.'s Ex. 25, at 7–40 ("Weekly Schedule")).[8] From September 10, 2014, to December 31, 2014, Jin received a flat wage of $460 per week. *See* Trial Tr. 12:6–8, 38:6–11, 47:15–20. On January 1, 2015, he received a raise to $470 per week. *See id.* at 11:1–3, 12:6–8, 47:22–25.[9] Jin did not receive or sign any written notice regarding his raise. *See id.* at 11:3–7. Throughout his employment, Jin was paid exclusively in cash. *See id.* at 11:13–15. Despite Fong's testimony to

---

[7] While plaintiff testified that he worked from September 2, 2014, until May 10, 2015, I credit the dates in defendants' weekly work schedule, which state that plaintiff worked from September 10, 2014, until May 2, 2015. *See* Pl.'s Ex. 25, at 7–40.

[8] While Fong testified that Jin received a formal notice of pay rate with his "[n]ame; address; contact number; how much for the rate, hourly rate; also how many hours of work; when the job begins; and his signature" (Trial Tr. 127:21–128:5), I credit Jin's testimony on this point.

[9] Fong disputes that Jin was paid these flat weekly wages. *See* Trial Tr. 138:16–139:13, 141:5–144:16. Fong does not recall Jin's specific salary but testified that pursuant to the restaurant's policy, Jin would have been paid minimum wage for the first 40 hours, overtime for excess hours, and an additional hourly wage for any days he worked more than a 10-hour shift. *See id.* Fong also maintains that Jin's wage was calculated weekly based on his timecard. *See id.* at 137:4–14. I find Jin's testimony that he was paid a flat weekly wage of $460 and $470 more credible, not only because I found Jin to be a credible witness, but also because Fong's credibility was undermined by his testimony that he "[does not] remember" whether Jin received the same amount of money each week and that Jin's timecard never deviated by more than a couple of minutes from his scheduled hours. *Id.* at 134:10–135:13; *see also id.* at 137:4–14.

the contrary (*see id.* at 129:9–130:21), I credit Jin's testimony that when he received his weekly wage, he did not see or sign a wage statement. *See id.* at 11:21–23, 39:4–12, 40:6–12.

Jin was scheduled to work 57.5 hours per week (*see* Weekly Schedule), but he occasionally arrived early and stayed late. *See* Trial Tr. 13:3–6 (testifying that he arrived 30 minutes to one hour early on Thursdays to "take [the] place of the dishwasher worker to do some dishwasher work[]"); *id.* at 23:5–16 (testifying that "[s]ometimes, according to the work schedule, it [was] time for [him] to stop working" but the head chef did "not allow [them] to leave until all the customers le[ft] the restaurant"); *id.* at 24:25–25:10 (testifying that he worked an extra hour—until midnight—on Saturdays). Jin took two 10–15-minute meal breaks during the day, and he was not required to punch out during his meal breaks. *See id.* at 15:2–12.[10] Because Jin worked approximately 45 minutes more than his scheduled hours on Thursdays and one hour more than his scheduled hours on Saturdays, I conclude that he was in fact working an average of 59.25 hours per week.

## II. Conclusions of law

### A. Defendants[11]

"An individual or entity may be held liable under the FLSA [only] if it is deemed an 'employer' under the statute." *Apolinar v. R.J. 49 Rest., LLC*, No. 15-cv-8655 (KBF), 2016 WL 2903278, at *3 (S.D.N.Y. May 18, 2016) (citing 29 U.S.C. § 203(d)). Here, plaintiff claims that

---

[10] I do not find that these breaks were long enough to qualify as a non-compensable "bona fide meal period." 29 C.F.R. § 785.19(a) ("Bona fide meal periods are not worktime. . . . The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period."); *see also id.* § 785.18 ("Rest periods of short duration, running from 5 minutes to about 20 minutes . . . . are customarily paid for as working time."); *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 499 (S.D.N.Y. 2017) (noting that the NYLL and FLSA standards for determining whether meal breaks are non-compensable are the same), *aff'd*, 752 F. App'x 33 (2d Cir. 2018).

[11] The parties concede that the corporate defendants are enterprises covered by the FLSA. *See* Defs.' June 17, 2019 Letter, ECF No. 162; *see also* Pl.'s June 17, 2019 Letter, ECF No. 163.

5

Original, East Brother, City, Duplicate, Si, Lam, and Fong each constituted Jin's employer. *See* Pl.'s Trial Br. ¶¶ 52–61, ECF No. 188. The Second Circuit uses an "economic reality" test to determine whether an individual meets the definition of "employer." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104–05 (2d Cir. 2013). The economic reality test examines four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 105 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008)). Courts in this Circuit generally interpret "[t]he statutory standard for employer status under NYLL [to be] nearly identical to that of the FLSA." *Olvera v. Bareburger Grp. LLC*, 73 F. Supp. 3d 201, 206 (S.D.N.Y. 2014); *see also Marcelino v. 374 Food, Inc.*, No. 16 Civ. 6287 (KPF), 2018 WL 1517205, at *12 (S.D.N.Y. Mar. 27, 2018).

The record in this case reveals that Original, City, Duplicate, and Si were not Jin's employers.[12] Jin worked only at the Flushing location, which was under separate ownership and management from the Midtown and Chinatown locations during Jin's employment. *See supra* Section I.A.[13] The fact that the restaurants may have occasionally recommended employees to one another (*see supra* note 6) does not establish that each had control over the others' employment practices. Further, while Jin occasionally saw Si at the Flushing restaurant, he testified that Shi—not Si—hired him, and that Si never instructed or spoke to him. *See id.* Witnesses He and Zhai also failed to establish that Si exercised control over Jin or the Flushing

---

[12] Defendants do not dispute that East Brother, Lam, and Fong were Jin's employers (*see* Defs.' Trial Br. 2, 5, ECF No. 189), and the evidence at trial established this fact. As discussed above, during Jin's employment, East Brother owned the Flushing restaurant, Lam and Fong were East Brother's sole shareholders, and both men were responsible for managing the restaurant's employees and setting restaurant policy. *See supra* Section I.A.

[13] It appears that Original ceased to exist in 2013, prior to plaintiff's employment; however, to the extent that the company continued operating, it played no role in the management of the Flushing restaurant. *See supra* Section I.A.

restaurant. *See id.* At most, the trial testimony demonstrated that after Si withdrew his shares from Flushing, he maintained a relationship with the owners and managers of that location. *See supra* Section I.A. Simply put, Jin has failed to show that Original, City, Duplicate, or Si meet any of the four factors of the economic-reality test. Accordingly, these defendants are dismissed.[14]

### B. FLSA and NYLL claims

The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation . . . in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). To establish liability for unpaid overtime pursuant to the FLSA, "a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946)).[15] Plaintiffs bear the burden of so proving by a preponderance of the evidence. *Hernandez v. NJK Contractors, Inc.*, No. 09-CV-4812 (RER), 2015 WL 1966355, at *1 (E.D.N.Y. May 1, 2015).

---

[14] Prior to trial, plaintiffs stated that they "intend[ed] to show that all Corporate Defendants constitute[d] a single integrated enterprise." Pl.'s June 17, 2019 Letter. To determine "whether a group of distinct but closely affiliated entities should be treated as a single employer for FLSA purposes," courts in this Circuit apply the "single integrated enterprise" test. *Nieto v. Vill. Red Rest. Corp.*, No. 17 Civ. 2037 (JCF), 2017 WL 4539327, at *4 (S.D.N.Y. Oct. 10, 2017) (quoting *Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014)); *see also Gyalpo v. Holbrook Dev. Corp.*, 577 B.R. 629, 639–40 (E.D.N.Y. 2017); *Apolinar*, 2016 WL 2903278, at *4. Under the test, "courts consider (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Nieto*, 2017 WL 4539327, at *4 (quoting *Juarez*, 29 F. Supp. 3d at 367). Plaintiff appears to have abandoned this argument. *See* Pl.'s Trial Br. ¶¶ 52–61. To the extent that plaintiff is pursuing this argument, however, it fails for the same reasons as plaintiff's employer argument.

[15] The NYLL also mandates overtime pay and contains the same exemptions as the FLSA. The Second Circuit thus engages in a single analysis under the FLSA to resolve both FLSA and NYLL claims, and I will do the same here. *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 78 (2d Cir. 2003); *Awan v. Durrani*, No. 14-cv-4562 (SIL), 2015 WL 4000139, at *9–10 (E.D.N.Y. July 1, 2015); *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 519 (S.D.N.Y. 2013).

The FLSA also requires every employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." 29 U.S.C. § 211(c); *see also* 29 C.F.R. § 516.2(a)(7), (9)–(10) (requiring employers to maintain and preserve payroll records that specify the "[h]ours worked each workday and total hours worked each workweek," as well as "[t]otal premium pay for overtime hours" and "[t]otal additions to or deductions from wages paid each pay period"). To prove their claims about failure to pay overtime, plaintiffs must "produce[ ] sufficient evidence to show the amount and extent of [the uncompensated] work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 361 (quoting *Anderson*, 328 U.S. at 687).

This evidence may be established in various ways. For example, "[w]hen the employer has kept proper and accurate records[,] the employee may easily discharge his burden by securing the production of those records." *Anderson*, 328 U.S. at 687. On the other hand, "'where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes,' the [Supreme] Court [has] concluded that '[t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work,' as such a result would be contrary to the 'remedial nature' of the FLSA." *Kuebel*, 643 F.3d at 362 (quoting *Anderson*, 328 U.S. at 687). The Second Circuit has established that "it is possible for a plaintiff to meet this burden through estimates based on his own recollection." *Id.* In this case, defendants' records are undoubtedly inadequate, as the alleged wage notices, wage statements, and timecards have all been lost (*see* Trial Tr. 130:22–131:13, 131:23–132:3, 137:15–138:11), and I find that Jin has met his burden of demonstrating his actual hours worked and pay received through his own credible recollection.

i. **Overtime violations**

Under both the FLSA and the NYLL, "once an employee works 40 hours in a week, he

8

must be paid 'one and one-half times [his] regular rate' for all excess hours." *Martinez v. Dannys Athens Diner Inc.*, No. 16-cv-7468 (RJS), 2017 WL 6335908, at *2 (S.D.N.Y. Dec. 5, 2017) (alteration in original) (quoting *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 88 (2d Cir. 2013)), *appeal docketed*, No. 18-80 (2d Cir. Jan. 10, 2018). Thus, the first step in calculating overtime is to determine the employee's "regular rate" of pay. The NYLL states that, in the hospitality industry, "[i]f an employer fails to pay an employee an hourly rate of pay, the employee's regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings . . . by the lesser of 40 hours or the actual number of hours worked by that employee during the work week." 12 N.Y.C.R.R. § 146-3.5(b); *see also Martinez*, 2017 WL 6335908, at *4; *Romero v. Rung Charoen Sub, Inc.*, No. 16 Civ. 1239 (VMS), 2017 WL 4480758, at *10 (E.D.N.Y. Sept. 30, 2017).[16] Accordingly, plaintiff's regular rate of pay in 2014 was his flat rate of $460 divided by 40 ($11.50 per hour), which leads to an overtime rate of $17.25 per hour. And plaintiff's regular rate of pay in 2015 was his flat rate of $470 divided by 40 ($11.75 per hour), which leads to an overtime rate of $17.63 per hour. Thus, for the 16 weeks he worked in 2014, plaintiff was owed $332.06 per week in overtime ($17.25 x 19.25), and for the 17.3 weeks he worked in 2015, plaintiff was owed $339.38 per week in overtime ($17.63 x 19.25). Plaintiff is therefore owed overtime compensation in the amount of $11,184.23 ($332.06 x 16 + $339.38 x 17.3).

---

[16] Under the FLSA, "[t]here is a . . . presumption that a weekly salary covers 40 hours," but "the employer can rebut the presumption by showing an employer-employee agreement that the salary covers a different number of hours." *Moon v. Kwon*, 248 F. Supp. 2d 201, 207 (S.D.N.Y. 2002) (quoting *Giles v. City of New York*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999)). Here, I "need not determine whether the presumption . . . was rebutted . . . because Plaintiff is entitled to recover under whichever statute provides greater relief." *Romero*, 2017 WL 4480758, at *11 (citations omitted); *see also Llolla v. Karen Gardens Apartment Corp.*, No. 12-CV-1356 (MKB)(JO), 2014 WL 1310311, at *11 (E.D.N.Y. Mar. 10, 2014) (noting that a plaintiff "is not entitled to recover cumulative damages for unpaid wages under both federal and state law" but may recover under the statute that provides more damages), *adopted in relevant part by* 2014 WL 1311773 (E.D.N.Y. Mar. 28, 2014). In this case, Jin is seeking recovery under the NYLL because it affords him greater relief. *See* Pl.'s Trial Br. ¶ 93. Accordingly, I will calculate his damages under the NYLL. *See Jiao v. Chen*, No. 03 Civ. 0165(DF), 2007 WL 4944767, at *17 (S.D.N.Y. Mar. 30, 2007).

### ii. Spread of hours

New York law provides that "[a]n employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required . . . for any day in which: . . . the spread of hours exceeds 10 hours." 12 N.Y.C.R.R. § 142-2.4. Spread of hours is defined as "the interval between the beginning and end of an employee's workday," which "includes working time plus time off for meals plus intervals off duty." *Id.* § 142-2.18. In other words, "[t]he NYLL spread-of-hours claim, for which there is no counterpart under the FLSA, provides that 'an employee is entitled to recover compensation for an extra hour of work at the minimum wage each day that the employee works in excess of ten hours.'" *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 45 (E.D.N.Y. 2015) (quoting *Shiu v. New Peking Taste Inc.*, No. 11-CV-1175 (NGG)(RLM), 2014 WL 652355, at *10 (E.D.N.Y. Feb. 19, 2014)). Any compensation awarded under this provision is to be "in addition to any claim for minimum-wage payments or overtime." *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 260 (S.D.N.Y. 2008). "A limitation upon a plaintiff's eligibility to recover for spread-of-hours is that the plaintiff not earn more than the minimum wage." *Fermin*, 93 F. Supp. 3d at 45. Because Jin's regular rate of pay was above the minimum wage, he is not entitled to spread-of-hours pay.

### iii. Notice claims

The NYLL also imposes certain notice requirements on employers. One such requirement is that each employer "provide his or her employees . . . , at the time of hiring, a notice containing" certain information, including the employee's "rate or rates of pay and basis thereof," the regular pay day, and the employer's name, address, and telephone number. N.Y. Lab. Law § 195(1)(a). The employee must sign and date the notice, which is required to be in the employee's primary language. *See id.* On and after February 27, 2015, the NYLL entitles a plaintiff to $50 for each workday that a wage-notice violation occurs, not to exceed $5,000. *See*

10

*id.* § 198(1-b); *see also Chen v. New Fresco Tortillas Taco LLC*, No. 15 Civ. 2158 (RA)(AJP), 2015 WL 5710320, at *8 (S.D.N.Y. Sept. 25, 2015), *adopted by* 2017 WL 818469 (S.D.N.Y. Mar. 1, 2017). Prior to February 27, 2015, employers were liable for $50 in damages for each *week* that the violation occurred, not to exceed $2,500. *See* N.Y. Lab. Law § 198(1-b) (effective April 9, 2011). As detailed earlier, Jin did not sign and date a notice with the information required by § 195(1)(a) when he was hired; he simply received a piece of paper on his second day of work with "$460" written on it. *See supra* Section I.B. He also did not receive a wage notice at the time of his raise. *See id.* Jin worked 24.3 weeks before February 27, 2015, and 9.1 weeks after February 27, 2015. Accordingly, he is entitled to $3,945 for wage-notice violations ($50 x 24.3 + $50 x (9.1 x 6)).

The NYLL also requires employers to provide their employees with paystubs on each pay day that list "the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages." N.Y. Lab. Law § 195(3). Since February 27, 2015, the NYLL has also provided employees with $250 per day, up to a total of $5,000, for violations of the paystub requirement. *See id.* § 198(1-d). Since Jin worked without a paystub for more than 20 days after February 27, 2015, he is entitled to the statutory maximum award of $5,000.

### C. Additional damages

#### i. Liquidated damages

Under the FLSA, a plaintiff is presumptively entitled to "liquidated damages equal in amount to actual damages," unless "the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for

11

believing that its acts or omissions did not violate the FLSA." *Barfield*, 537 F.3d at 150 (quoting 29 U.S.C. § 260). "'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them." *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997). As a result, the employer's "burden is a difficult one, with double damages being the norm and single damages the exception." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999). Similarly to the FLSA, the NYLL allows plaintiffs to recover "liquidated damages equal to one hundred percent of the total . . . underpayments found to be due" "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." N.Y. Lab. Law § 663(1). Although this text "is not identical to that of the FLSA . . . , courts have not substantively distinguished the federal standard from the current state standard of good faith." *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015). Here, defendants have failed to demonstrate that their failure to pay plaintiff in accordance with the law was in good faith. In fact, based on the trial testimony, I conclude that defendants were aware of the wage requirements but simply failed to comply with them. *See supra* Section I.A. Accordingly, plaintiff is entitled to $11,184.23 in liquidated damages.

      ii.  Interest

The NYLL, unlike the FLSA, permits the award of both liquidated damages and prejudgment interest. *Khurana v. JMP USA, Inc.*, No. 14-CV-4448 (SIL), 2017 WL 1251102, at *17 (E.D.N.Y. Apr. 5, 2017); *Fermin*, 93 F. Supp. 3d at 48. Under New York law, a prevailing employee is entitled to prejudgment interest at a rate of 9% per year for a NYLL claim. *See* N.Y. C.P.L.R. §§ 5001, 5004. While courts have discretion in determining a reasonable date from which to award prejudgment interest, "[a] single reasonable intermediate date is the median date

between the earliest and latest each Plaintiffs' NYLL claim accrued." *Hernandez*, 2015 WL 1966355, at \*51; *see also Khurana*, 2017 WL 1251102, at \*17; *Coulibaly v. Millennium Super Car Wash, Inc.*, No. 12-CV-4760 (CBA)(CLP), 2013 WL 6021668, at \*15 (E.D.N.Y. Nov. 13, 2013). Prejudgment interest will thus be calculated from the median date between plaintiff's start and end date of employment with defendants, which is January 5, 2015. Plaintiff is also awarded post-judgment interest at the statutory rate prescribed by 28 U.S.C. § 1961. *See Coulibaly*, 2013 WL 6021668, at \*16.

## CONCLUSION

As set forth in this opinion, I find that defendants East Brother, Lam, and Fong are liable for violations of the FLSA and the NYLL. Plaintiff is entitled to the following relief: (1) $11,184.23 in unpaid overtime compensation; (2) $11,184.23 in liquidated damages; (3) $8,945 in statutory notice violations; and (4) pre- and post-judgment interest. Plaintiff is also entitled to a 15% increase in the damages owed to him "if any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later." N.Y. Lab. Law §§ 198(4), 663(4); *see also Martinez*, 2017 WL 6335908, at \*6. Under the FLSA and the NYLL, a prevailing plaintiff is entitled to reasonable attorneys' fees and costs. *See* 29 U.S.C. § 216(b); N.Y. Lab. Law § 663(1). Accordingly, plaintiff is entitled to recover such fees and costs. Plaintiff's forthcoming motion is respectfully referred to Magistrate Judge Orenstein.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated: July 19, 2019
Brooklyn, New York